[Civ. No. 12812. First Dist., Div. Two. May 29, 1945.]

JOSEPH DOETSCH et al., Respondents, v. FRANCES E. WAGNER, Appellant.

Owen D. Richardson for Appellant.

M. Henry Robidoux for Respondents.

GOODELL, J.—This is an appeal from a judgment quieting title to a parcel of real property.

On August 29, 1941, an agreement was entered into for the sale by the plaintiffs to the defendant of a piece of real property in Santa Clara County consisting of about nine acres (most of which is a gravel bed) lying within the larger parcel described in the complaint. The defendant entered into possession of the land, installed equipment thereon, removed gravel therefrom (as contemplated), and after about nine months ceased quarrying operations and removed most of her equipment. This suit was commenced about six months thereafter. The court found that the defendant had abandoned the property and had forfeited whatever rights she had under the contract, also that the contract was void for uncertainty.

The appellant's position is that the contract is clear and certain except in a few minor particulars; that it does not obligate appellant to extract gravel nor specify any quantity that must be extracted, nor obligate her to occupy the property.

If the appellant abandoned the property and relinquished all rights under the contract the judgment should be affirmed regardless of whether the contract is void for uncertainty or not. Therefore the first inquiry seems to be whether the finding of abandonment (which is as follows) is supported by the evidence: "That in September of 1942, defendant Frances E. Wagner abandoned the real property . . . with the intention of forfeiting her rights in and to said real property; that plaintiff took possession of said property after said abandonment and said plaintiffs ever since have been and now are in the exclusive possession of said property." The court concluded: "That defendant Frances E. Wagner forfeited all of her rights under the Agreement . . . and said Agreement . . . became terminated in September of 1942."

In presenting this case on appeal appellant's counsel was

confronted with this finding, yet in his opening brief he made no attack upon the sufficiency of the evidence to support it. All that is said therein on the subject is that no breach resulted from the alleged abandonment since the agreement "did not obligate the Defendant to extract gravel therefrom or specify any quantity that must be extracted, nor obligate the Defendant to occupy the property." In the respondents' brief counsel makes a definite point of abandonment and discusses the evidence thereon, but in appellant's closing brief no reply whatever is made to respondents' discussion of that point. We are therefore left without any enlightenment whatever from appellant's counsel on this vital point.

In considering the question of abandonment it is necessary to examine the rather unusual provisions of the contract. Respecting the purchase price the contract provides: . . . "the party of the second part hereby covenants and agrees to pay to the party of the first part the sum of $700.00 per acre, . . . in the manner following, that is to say: $10.00 upon the execution and delivery of this Agreement, the receipt whereof is hereby acknowledged; The party of the second part agrees to extract gravel from said property at a price of 25 cents a yard, said money to be deposited each month with the San Jose Title Co. or any other institution as may be agreeable to all parties. The said money shall remain in escrow pending an agreement with the Mortgagee to release said property upon the payment of a satisfactory amount per acre, not exceeding $700 per acre, less costs."

The purchase price of the nine acres at $700 per acre comes to $6,300. Nowhere in the contract (except the provision for a nominal and trifling down payment of $10) is there any specification of the time and manner of payment except the provision for 25 cents for each cubic yard of gravel taken out. The requirement for payment "in the manner following" preceding the "25 cents a yard" would indicate that that method, unusual as it is, was the method upon which the parties agreed. Otherwise there is no method at all adopted for the payment of the purchase price. If $6,300 had to be eventually paid, then at the rate of 25 cents a yard, 25,200 yards would have to be removed. In the nine months of operations only 700 yards were removed, and at that rate of progress it would take over twenty-seven years to complete the

payment of the purchase price! Attention is drawn to this rather startling circumstance in connection with the inquiry as to abandonment for the reason that the trial court might have weighed the slow progress during the nine months of operations against the comparatively large amount of money to be eventually paid (stretched out over a long period) and considered the influence these factors might have had on the appellant in making up her mind whether to keep going or to quit.

Is the finding of abandonment supported by the record? The appellant had been in the gravel business, or business akin to it, for fourteen years. Interested with her in this contract as a partner was one William H. Guernsey, who was experienced in the same business and who had charge of the physical operations on the property. In September, 1941, immediately after the contract was signed, they moved machinery, equipment and timbers onto the property, and built certain structures. There was some equipment already there including a bunker, rock crusher, hopper and a couple of engines. But some of the equipment was removed, so it took two or three months to get the place ready to operate. The appellant testified that the equipment and building which she put on the property cost her "no less than $2000 about" and the labor about $1,000 more. She probably meant her *original* cost, for in her answer she pleaded that her installations were at a cost of approximately $300 and the court so found.

From September, 1941, until June 2, 1942, when the last load of gravel was hauled out, there were removed approximately 700 yards. This yardage is determined by the sum of $175 which the appellant paid. At the contract rate of 25 cents per yard it would mean that 700 yards were moved in those nine months. Payments were made as follows: in December, 1941, $50; in January, 1942, $25; in March, 1942, $50; and in April, 1942, $50.

Troubles of several varieties developed. The quality of the gravel was not as high as the appellant had anticipated; they ran into clay and silt which they had not expected to find. Appellant testified that the gravel was "in bad condition, not as deep as I thought it would be. We expected to use the drag-line down to eight or twelve feet. We run into so much clay and dirt that the city of San Jose wouldn't accept it."

Guernsey testified that the gravel was so dirty it clogged the machinery; that San Jose turned it down because it was dirty and that they could not put in a gravel washing machine because they could get no labor.

Business was bad. Appellant and Guernsey both testified to disappointing business conditions. They found business so bad that it would not support both families (appellant's and Guernsey's). When water was needed for washing the gravel the appellant thought "the business didn't warrant going to further expense." Guernsey had a conversation with Doetsch in which the former told the latter that there was not much business and not "enough money in it at the present amount of business to keep the place going, and I told him I thought that I had better pull the machinery out until such times as business was better, and the only reason for taking the machinery out was because the neighbors there stole the gasoline and broke the machinery so that we couldn't run more than one-half of the time." The appellant testified that the principal reason she discontinued operations "was the war conditions and priorities came into effect at that time, and although I was more or less prepared to take it out and manufacture, many orders I have were cancelled that have never been filled, and I tried to get smaller orders and carry on, tried to sell it at the plant and couldn't, and about in the latter part of September there was a call for Mr. Guernsey from Washington, D. C. to report to the army engineers in San Francisco which he did." A witness produced by the plaintiff partially contradicted her testimony as to the decline in business. He testified that the war had *created* a demand for gravel, although he admitted that small business had fallen off. The appellant elsewhere admitted that she was not prevented from removing gravel because of priorities.

The machinery and equipment caused trouble. All the equipment which the appellant moved onto the place was second-hand. At first the gravel was removed by hand. There were "several very inconvenient break-downs" and the "machinery we put in at a great deal of expense was not adequate. We had to change machinery, so months went by without taking out any gravel whatsoever." The jaws and legs and other parts of the crusher were broken. Doetsch testified that

Guernsey told him that if he had the equipment he could get some gravel out "but Mrs. Wagner will not spend a cent," and that he [Guernsey] "had an awful hard luck story." Some of the equipment had been rented to the appellant by the witness Carter. Guernsey on cross-examination testified "there wasn't any business to amount to anything, and I told him [Doetsch] we were thinking of pulling the equipment out of there on account of it being wrecked, and not being business enough there to warrant keeping a man there all the time —the equipment being wrecked and office being wrecked, and stuff being stolen and all, he was going to pull it out." The appellant testified that they had quite a bit of trouble with the equipment because of the condition of the material.

The appellant testified as to her conversation with Doetsch on one of his visits to the place, as follows: "He saw us on the property; he saw everything that went in, did have trouble, couldn't keep the thing going . . ." further, that he [Doetsch] then offered to take 10 or 15, or even 5 cents a yard, instead of 25 cents which was the contract rate, to help appellant get started. Guernsey testified to the same effect. Doetsch denied this and he also denied ever telling the appellant that she need not extract gravel until it became profitable to do so or telling Guernsey they had nothing to lose and everything to gain and the court found with the plaintiffs on that conflict. The record is quoted verbatim on what to us is not clear: "Q. Did he ever say anything about not requiring him to go ahead with the extraction of gravel? A. Yes. Q. What did he say? A. If we had to suspend for any reason it was inadvisable, he couldn't take it out, we couldn't, and no one else." We do not pretend to know what this means.

It is undisputed that the last load of gravel removed by the appellant was on June 2, 1942. Guernsey left for war work in October, 1942, and before leaving "took out as much [equipment] as he could." The record shows no discussion between appellant and respondents when the equipment was removed showing any intention to return or to resume operations. Between June 2d and the time Guernsey left there seems to have been some pilfering going on. Doetsch testified that between June and September, 1942, gravel was removed most every day by strangers who came in and got it when Guernsey was not there, saying Guernsey had told them to help themselves. The pilfering was not confined to the gravel

but apparently the appellant's equipment suffered as well from that and from malicious mischief or vandalism according to Guernsey's testimony. Appellant testified that she removed some of the equipment "because it was being destroyed and wrecked, practically ruined." Just when this occurred is not clear from the record. There were left on the property mounts, chutes, bunkers, timbers and the small building, which were still there at the time of the trial. Two shovels also were left, which the appellant valued at about $50. A witness estimated the cost of replacement of the equipment left on the property at $350 or $400 at the time of trial. In the judgment the defendant is expressly given the right to remove all her personal property from the premises.

About September 8, 1942, Doetsch placed a barricade across the road with the sign on it to keep out. There were some incidents at the barricade but it is sufficient to say that the evident purpose of Doetsch in putting it up was to treat the appellant as no longer entitled to enter. Mrs. Doetsch testified that Guernsey took the machinery out after the barricade had been put up. It should be noted also that in December, 1942, the appellant tendered a check for $50 which was returned by the respondents, and a month or two later another check or money order for $50 was tendered and rejected. The case was tried in December, 1943, which was about fourteen months after the appellant had removed her equipment from the property. At that time the appellant was asked, "Now, if and when you are able to extract gravel do you wish to keep on?" to which she replied, "Yes, I should like to do that." Also in a letter the appellant stated that she would open the plant as soon as business warranted. The foregoing is a fair résumé of the evidence bearing on abandonment.

There can be no doubt that this contract, unusual and uncertain as it is, contemplated (if it meant anything at all) that the appellant would take possession of the place and actively quarry gravel therefrom. The appellant's position in her opening brief is that "No breach of the Agreement resulted from the alleged 'abandonment' of the real property, since the Agreement did not obligate the Defendant to extract gravel therefrom or specify any quantity that must be extracted, nor obligate the Defendant to occupy the property." What that contention comes to is simply this: that the appellant was free

to stay off the property altogether or to move on and off the property at will, taking out as much or as little gravel as she pleased, for an indefinite period of time,—an option pure and simple. That that is *precisely* what it comes to is confirmed by appellant in her brief as follows: "And if it be argued that such a covenant gives the Defendant a perpetual right to extract gravel, the reply is that such is the language of the Agreement. . . ." At oral argument that contention was repeated. The contrary is settled by the language of the contract, wherein the appellant bound herself, in so many words, *"to extract gravel from said property at a price of 25 cents a yard."* The only way she could extract gravel was by occupying the quarry. And the only way provided for the payment of the purchase price of $700 an acre for nine acres was by that peculiar method. Otherwise the contract is wholly meaningless. The contract contains a provision that the appellant shall be *entitled* to possession, but her agreement to take gravel, and thereby to pay for the acreage, by its very terms *binds her to take possession.* The facts remain that possession was taken, that gravel was removed, that such removal continued up to June 2, 1942, and that for the ensuing four months no gravel was removed under the contract. Then in September or October, 1942, most of the machinery and equipment (the best of it) was taken off the place.

The evidence bearing on the question of abandonment contains numerous declarations by the appellant and by Guernsey showing their determination to quit. Whether those declarations, together with the other evidence and the acts and conduct of the parties, indicated an intention to return at some time in the indefinite future and make another *try,* or to quit for all time, presented a question of fact. In deciding that question the court had before it a lot of testimony as to the inferior quality of the gravel which, in itself, would not be expected to tempt the appellant into a resumption of operations, and in addition to that it must be remembered that operations were at a standstill for four full months before Guernsey's departure for war work. In short, with the appellant in possession, her acts and conduct in surrendering that possession and in moving off her machinery and equipment was strong and convincing evidence of an intent to *abandon the property and relinquish all rights under the contract,* particularly when coupled with the declarations so frankly

made while operations were still on. From all the facts and circumstances the court found that the appellant was through with the Doetsch place *for all time,* and there is an abundance of evidence to support that finding.

The appellant pleaded that the respondents had ''waived the terms of said written Agreement pertaining to the extraction of gravel, the price thereof, the payments therefor, and also the terms of said Agreement for the forfeiture of all rights under said Agreement and all rights to moneys theretofore paid by this Defendant'' because, she alleged, the plaintiffs had stated on numerous occasions that if for any reason the gravel could not be extracted, operations could be suspended and that the price per yard could be reduced from 25 cents to 10 or 5 cents if the appellant desired it. The appellant's and Guernsey's testimony to that effect and the plaintiffs' denial thereof have been already given. The court made a finding negativing this claim of waiver.

As already suggested, if the contract of August 29, 1941, instead of being, as it is, full of uncertainties, had been absolutely precise, definite and certain and the appellant had entered into possession under it and had then moved out under the circumstances shown by this record, a finding of abandonment of the property and a relinquishment of all rights under the contract would have been fully justified. It is therefore unnecessary, in view of the conclusion at which we have arrived, to discuss or decide the question whether, as the court found, the contract is void for uncertainty. One of the appellant's points is that the respondents cannot now rely upon uncertainty in view of the fact that the parties acted under the contract for about a year and therefore they must have understood its terms. (Citing 6 Cal.Jur. §184, p. 304, ''Construction by Parties''). How they acted under it is fairly well disclosed by the summary of the evidence which we have given, which we think does not establish very much by way of ''practical construction.'' Be that as it may, that point falls under the heading of uncertainty, and it need not be decided herein.

The judgment is affirmed.

Nourse, P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 26, 1945.